(Not for publication)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| ANEQUA R. JOYCE, et al., | : | |
| | : | |
| Plaintiffs, | : | Civil No. 04-5345 (RBK) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| CITY OF SEA ISLE CITY, et al., | : | |
| | : | |
| Defendants. | : | |
| | : | |

**KUGLER**, United States District Judge:

This matter comes before the Court on a motion by City of Sea Isle City ("Sea Isle City"),

William J. Kennedy ("Kennedy"), City of Sea Isle City Police Department, and Jon Gansert

("Gansert") (collectively "City Defendants") for summary judgment against Anequa R. Joyce

("Anequa"), Glendon Durham ("Glendon"), and Doretha Waters-Rice ("Waters-Rice")

(collectively "Plaintiffs").  Further before the Court is a motion by Sea Isle City School, Sea Isle

City Board of Education, Joann Smith ("Smith"), and Gail Rodger ("Rodger") (collectively

"School Defendants") for summary judgment against Plaintiffs.  Additionally before the Court

are individual motions for summary judgment against Plaintiffs by Dennis R. Felsing ("Felsing"),

Elizabeth Tegler ("Tegler"), Angela Davenport ("Davenport"), and Kennedy.  Plaintiffs accuse

Defendants of race discrimination in violation of their rights under the United States and New

Jersey Constitutions, of violating the New Jersey Law Against Discrimination, and of malicious

prosecution.  For the reasons set forth below, the Court will grant in part and deny in part the

motions of School Defendants, Police Defendants, Felsing, Davenport, and Kennedy.  The Court

will deny Tegler's motion in its entirety.

## I.      BACKGROUND[1]

In August of 2003, Waters-Rice, who is black, moved her family to 122 43rd Street in

Sea Isle City, New Jersey to live with her new husband, Walter Rice ("Rice"), who is white.

Their household consisted of Rice and Waters-Rice, as well as Waters-Rice's sons Daniel Young

(age 26), Luis Waters (age 19), and Glendon Durham (age 13), her granddaughter Anequa Joyce

(age 8), and family friends Joe Evans, who is black, and Sarah Shaffer, who is white.  At the time

Sea Isle City had few, if any, other African American residents and no full-time African

American police officers.  (Pls.' App. 103-04, Gansert Dep. at 100-03.)

### A.      Sea Isle City Police

Soon after moving in, troubles began.  Waters-Rice recalls several incidents involving a

next door neighbor, Anthony Pittaluga.  In early September, Pittaluga called Rice on the

telephone and told him to "tell those animals they're making too much noise over there."  (City

Defs.' Ex. 4 at 249-50.)  Pittaluga also allegedly addressed Waters-Rice as "bitch" when he saw

her, and on between ten and twenty occasions during the fall of 2003, the police were called to

the residence, purportedly in response to Pittaluga's complaints of noise.  (Pls.' App. 189, Rice

Dep. at 278; Id. 263-64, Waters-Rice Dep. at 260-63.)

During one visit by the police, an officer allegedly told Waters-Rice words to the effect of

_____

[1]  Because this case is before the Court on motions for summary judgment, the Court
recites the facts in the light most favorable to Plaintiffs.

"yous have to go back inside . . . we've got complaints of you n****** out here or the smell and you have to go in" and "you n****** are out here and it's upsetting the neighbors and they're scared." (Pls.' App. 263-64, Waters-Rice at 260-62.) Waters-Rice recalls another particular officer saying to her "when you look a white person in the face, you put your head down and show some respect." (Id. at 269-70.) Later, Waters-Rice recounted, that same officer would ride by her house and raise his index finger to his eye and point at her threateningly. (Id. at 262.) Plaintiff Durham testified to similar encounters with police in which they addressed him and his brother as "n******" and admonished them to get in their house. (City Defs.' Ex. 7 268, 270-73.)

     **B.**     **The Christmas Play**

     That year, Waters-Rice's granddaughter Anequa was enrolled in the second grade at Sea Isle City's public school, in which approximately a hundred students are enrolled. On Friday, November 21, 2003, Anequa was in Defendant Gail Rodger's music class. The class was starting their preparation for the school holiday program, which involved songs celebrating Christmas, Hanukkah, and Kwanza, as well as a Christmas play. (Pls.' App. 214, Smith Dep. 51.) Rodger admits that she instructed Anequa to color instead of joining the other students practicing for the play. (Id. 194-95, Rodger Dep. 32-33.) Anequa recalls Rodger explaining that Anequa would not be rehearsing because Anequa was black and "black people don't celebrate Christmas." (Id. 136a, Anequa Dep. II 110.)

     When Anequa came home from school that day, she was crying. She told Waters-Rice that she could not be in the Christmas play "because [she] was different" and that Rodger made her sit on the floor drawing pictures while everyone else was practicing for the play. (Id. 269;

Waters-Rice Dep. 337-38.)  Waters-Rice told Anequa that she would go to school on Monday to find out why Anequa was being excluded from the play.  That Monday, when Anequa was getting dressed for school, she poured white powder over her face and hands and told Waters-Rice, "Mommy, it's no problem, I'm white, it won't be no problem and they'll let me back in the play . . . I'm not different anymore, I'll fit in."  (Id. 271, Waters-Rice 347-48; see also id. 66, Glendon Dep. 305-07.)

### C.    Meeting at Sea Isle City School

Later that morning, November 24, 2003, Waters-Rice, her husband, and their friend Sarah Shaffer went to Sea Isle City School.  There, they met with Defendant Principal Smith, Assistant Principal Fiedler, and Defendant Rodger.  When Waters-Rice questioned Rodger about why Anequa could not be in the play, Rodger explained that she had confused Anequa with another black student and thought Anequa was Muslim or Jehovah's Witness, and she apologized.[2]  (City Defs.' Ex. 4 at 352-53.)  Waters-Rice responded that Rodger should be apologizing to Anequa, not her, which Rodger then left the meeting to do.  (Id. 353.)

Waters-Rice testified that at that point, she felt the issue with Anequa had been resolved and joked that she was happy that she "didn't have to kick nobody's butt."  (Pls.' App. 273, Waters-Rice 357.)  Rice and Shaffer remembered the comment the same way, and Shaffer recalled and that everyone present laughed in response.  (Id. 210, Shaffer Dep. 54-55; id. 187, Rice Dep. 127-29.)  Smith testified that Shaffer said to Waters-Rice, "I'm glad this

---

[2]  Defendant Smith stated in her deposition that Rodger had confused Anequa with another black girl, who was in fourth grade.  (Pls.' App. 215, Smith Dep. 53-54.)  Rodger testified that it was a first grade black boy whom she had been told was a Jehovah's Witness. (Id. 194, Rodger Dep. 29.)

misunderstanding was resolved" and that Waters-Rice responded to Shaffer, "We're really lucky we resolved this, because I came here, today, to hurt somebody.  You're lucky that you won't have to cook dinner for Thanksgiving, now, because I'll be home.  Because I was going to be in jail, because somebody in this school was going to end up in the hospital."  (Pls.' App. 216, Smith Dep. 59.)  Fiedler remembers Waters-Rice saying approximately the same thing to Shaffer.  (City Defs.' Ex. 15, Fiedler Dep. 18.)  Fiedler also testified that both he and Smith ignored the comment, that no one raised their voice, and that he did not feel threatened.  (Id. 19, 37-38.)

Waters-Rice testified that then Smith asked her where she came from.  Waters-Rice answered that she was from the Seabrook area, to which Smith allegedly replied "my husband teaches in the Goultown [sic] area.  He used to teach your type of people."  (Pls.' App. 272-73, Waters-Rice Dep. 353-56.)  Waters-Rice and Rice both testified that Shaffer then asked Smith what she meant by "your type of people," to which Smith allegedly replied, "black . . . you know what I mean, darkies."  (Id. 273, Waters-Rice Dep. 356-57; id. 186, Rice Dep. 125-26.)  During that conversation Smith also purportedly said that she was not prejudiced because she had a "n***** friend."  (Id. 208-09, Shaffer Dep. 49-50.)

The meeting concluded, and Waters-Rice, Rice, and Shaffer left the school around 9:00 a.m.  (City Defs.' Ex. 37.)

### D.    School Officials Summon Police

At some point afterwards, Nancy Ramundo, another school employee, stated that she got a telephone call from either Justine Harkins (a neighbor of Waters-Rice's) or her husband telling her "Anequa's mom was very upset . . . that she made threatening statements; and that they wanted me to be aware."  (Id. Ex. 18 at 24.)  On an unknown date, Ramundo also signed a

statement that reads: "It was reported to me today, November 24, 2003, that Mrs. Rice in a conversation with another parent stated that 'if she had to stab somebody, kill somebody, have to go to jail, 'cause I'll hurt somebody.'" (Id. Ex. 42.)  Ramundo, however, does not specifically recall preparing this statement.  Smith testified that the school had received a call that morning from Harkins stating that Waters-Rice had come to her house and said she was going to stab somebody, she was going to kill somebody, and if she had to go to jail, she was going to jail, because she was going to hurt somebody." (Id. Ex. 14 at 61.)  Fiedler testified he remembers "hub-bub about, something about [Ramundo] saying something to somebody." (Id. Ex. 15 at 18.)  Harkins denied telling Ramundo that a parent was coming over to hurt somebody.  (Pls.' App. 122, Harkins Dep. 179-80.)  Waters-Rice stated that she never spoke with Harkins about the situation, and Plaintiffs allege that Ramundo's note was fabricated after the fact by Defendant Smith and/or the police.

In any event, around 11:24 a.m., Smith called the police to report that Waters-Rice had made a threat.  Defendant Detectives Gansert and Felsing arrived at the Sea Isle City School in response to her complaint.  They interviewed Smith and Fiedler for about twenty minutes.  (City Defs.' Ex. 17 at 73.)  Before returning to the police department, Gansert and Felsing instructed Fiedler and Smith to make written statements.  Gansert's police report from that meeting does not include any reference to the alleged telephone call from Harkins.  (Pls.' App. 312-13.)

Felsing prepared an "Officer's Information Form" in which he attested that he has reason to believe that Waters-Rice was dangerous to herself, to others or to property "because subject stated to school staff that she would come back and do bodily harm to them." (Id. 32.)  Gansert prepared a complaint in which he wrote that Waters-Rice had made verbal threats "directly to the

6

Sea Isle City Public School Staff that she would go to jail because she was going to commit violence upon the staff, specifically by stabbing them." (Id. 314.) Gansert then called a municipal judge on the phone and obtained a warrant for Waters-Rice's arrest for making terroristic threats. Bail was set for $1,000 ROR with the condition that Waters-Rice not have further contact with the school. (City Defs.' Ex. 17 at 74.) At his deposition, Gansert testified that neither Smith nor Fiedler told them that Waters-Rice intended to "come back and do bodily harm to them." (Pls.' App. 111-12, Gansert Dep. 144-45.) In addition, Fiedler and Smith testified that they never told the police about a specific threat involving stabbing. (Id. 94-95, Fiedler Dep. 38-41; id. 218, Smith Dep. 67-68.)

There is conflicting testimony regarding why the police chose to press charges against Waters-Rice. Gansert stated that they would not have proceeded with charges, except Smith and Fiedler insisted that they do so. (Id. 107, Gansert at 115-16.) On the contrary, Fiedler swore that neither he nor Smith told the Police to press charges. (Id. 94-95, Fiedler Dep. 40-41.) Regardless of who motivated the filing of the charge, on December 17, 2003, the Cape May County Prosecutor dropped the case against Waters-Rice. (Id. 319.)

### E.    Police Visit Plaintiffs' Home

Following the issuance of the warrant, Gansert, Felsing, Officer LaRosa, and possibly other officers, went to Waters-Rice's residence to arrest her. (Id. 101, Gansert Dep. 90-91.) They did not have a search warrant. When the police arrived, only Rice, Joe Evans, and Waters-Rice's son Luis Waters were home. Officer LaRosa testified that the police asked for and received permission to enter the house (id. 166, LaRosa at 30); however, Waters testified that he was sitting inside playing a video game when the Police walked in the door and asked for his

7

mother.  (<u>Id.</u> 248, Waters Dep. 38.)  Luis testified further that the Police ordered him to sit and stay where he was, while they went through the house.  (<u>Id.</u> 43.)  Felsing and LaRosa entered a bedroom and observed Rice in what they described as a "trancelike state."  Rice attests that he was not aware that the Police were in the house at that time because he was meditating.  (City Defs.' Ex. 5 at 141-42.)

Upon returning home, Waters-Rice learned that the police had been there looking for her. Both she and Shaffer observed their clothes on the floor of their bedrooms next to open drawers and closets.  (Pls.' App. 279, Waters-Rice Dep. 508, 530-36; <u>id.</u> 211, Shaffer Dep. 62.)  Waters-Rice then called the police and went to the station with Rice around 6:00 p.m. for processing.

### F.    Police Return to Plaintiffs' Home

The following day, at least three police officers, including Gansert and Felsing, returned to Plaintiffs' residence accompanied by John Kearney from Cape May County's Social Services, adult protective services.  Police had contacted Kearney as a result of their observations of Rice the previous day and their concern that he was being subject to elder abuse.  (<u>Id.</u> 148, Kearney Dep. 42-43; <u>id.</u> 82, Felsing Dep. 44-45.)  This time, Waters-Rice was at home, although the police evidently mistook her for Rice's housekeeper.  (<u>Id.</u> 285, 287, Waters-Rice Dep. 567, 608.) During that visit, a police officer allegedly referred to Waters-Rice as a bitch.  (<u>Id.</u> 287, Waters-Rice Dep. 608.)

While Kearney and other police were in the living room talking with Waters-Rice, Officers Felsing and Boyer were in the adjacent porch, which also served as a bedroom for two of Waters-Rice's adult sons, Young and Waters.  According to Young and Waters, they had been in the process of cleaning the room when the police arrived and had placed a three-foot long

sheathed sword on a bed. (Pls.' App. 303, Young Dep. 55.) Waters testified that he picked up the sword to place it back in the corner where it was normally kept, and as he did so, Officer Boyer pulled his gun, put it to Waters' head, and threatened to "blow [his] brains out." (Id. 303, Young Dep. 53-54.) In addition, Young and Waters testified that a tape recorder was going during these events, but that when Young removed the tape to keep as evidence, a police officer took it and broke it. (Id. 305, Young Dep. 74-76.)

Since Kearney was not able to privately interview Rice on that occasion, he ordered a hearing to determine Rice's well-being. When Rice and Waters-Rice came to court for the hearing, Kearney had a private meeting with Rice and satisfied himself that Rice was not being exploited or abused. (Id. 148, Kearney Dep. 45-46.) As a result, the hearing did not take place and the matter was closed.

### G. School Board Meeting

At the time of the events in question, Defendant Kennedy served both as Chief of Police and President of the Sea Isle City School Board. Soon after the events of November 24, 2003, the School Board held a meeting in which Smith reported to the Board that Waters-Rice had come to the school to complain about Anequa being excluded from the school play. Smith explained that Rodger had mistaken Anequa for another student who was a Jehovah's Witness, and that the incident concluded when Rodger apologized to Anequa in front of the class. (Id. 158, Kennedy Dep. I 65-68.) Smith did not inform the Board of the supposed threat from Waters-Rice, the subsequent criminal charges, or the dismissal of those charges. (Id., Kennedy Dep. 66-67.) By virtue of his role as Chief of Police, Kennedy knew at that time about the criminal charges against Waters-Rice, but he did not volunteer that information to the Board.

9

(Id., Kennedy Dep. 67-68.)

### H.    Glendon at School

Plaintiffs allege that following Waters-Rice's meeting with Smith, Fiedler, and Rodger, teachers and fellow students started treating Glendon differently.  (Id. 53, Glendon Dep. 99-100.) Glendon claims to have overheard Smith use a racial slur while talking to another teacher in the hallway.  In addition, Glendon began to suffer racial taunts and physical abuse at the hands of his classmates.  (Id. 47-48, 50, Glendon Dep. 70-75, 86-88.)  Plaintiffs allege that despite the presence of teachers during these occurrences, no one did anything to stop the harassment.  Smith attests that she knew Glendon was being teased, but not that students were calling him racial slurs.  (School Defs.' Br. 13-14.)  Defendant Angela Davenport, however, recounted a specific instance where Smith asked her to sit in on a meeting with three boys who had used racial slurs against Glendon.  (Id. 41-42, Davenport Dep. 76-78.)  Similarly, Glendon stated that he reported the abuse to both Fiedler and Smith, but that their response was ineffective.  (Id. 48, 50-51, Glendon Dep. 74, 88-92.)  Glendon also testified that his eighth grade teacher, Defendant Elizabeth Tegler, "just turned her head" to the abuse, and that Ramundo, who was responsible for Glendon's special needs education, said she was unaware that Glendon was being picked on.  (Id. 181, Ramundo Dep. 107-08.)

As a result of this torment, on one occasion, Glendon left his class, went to Anequa's classroom, and insisted they go home.  (Id. 54-55, Glendon Dep. 101-08.)  Glendon also started avoiding going to school and was absent more than fifty times between late 2003 and the spring of 2005.  (Id. 275, Waters-Rice Dep. 399-400; id. 56, Glendon Dep. 109-12; id. 181-82, Ramundo Dep. 108-09.)  Plaintiffs' expert has opined that the trauma he suffered at the hands of

10

other students has caused Glendon substantial harm, and that he needs long-term treatment to cope with his anxiety and its physical manifestations.  (Id. 370-72, Report of Robert L. Sadoff, M.D. at 15-17.)

I.      **Alleged Retaliation**

Plaintiffs filed this lawsuit on November 1, 2004, and they highlight several subsequent incidents, which they believe were retaliatory.  Plaintiffs allege that Davenport, purporting to provide a special education session for Glendon while his regular special education teacher was absent, told him that she had read about his family's lawsuit in the paper and that she wanted to talk to him about.  (Id. 62, Glendon Dep. 232.)  When Glendon told her that he did not want to talk to her about the lawsuit, she allegedly told him that she would pull him out of class every day until his mother came to the school to discuss it.  (Id. 60, Glendon Dep. 222-23.)  On another occasion, Davenport dropped in on Anequa's class, insisted on being Anequa's partner in a class exercise, and made Anequa feel uncomfortable by continually putting her arm around her.  (Id. 131, 133-34, Anequa Dep. I 78-79, 110-14.)  Prior to the filing of the lawsuit, Davenport once walked by Anequa's classroom and remarked that it smelled like an animal in the classroom, a comment that Anequa felt was directed at her.  (Id. 130, 132, Anequa Dep. I 75-77, 99.)

In March of 2005, Glendon's teacher, Defendant Tegler, had her students do a voluntary assignment involving collecting money for charity.  (City Defs.' Ex. 90.)  Due the objections of several parents, the project was prematurely halted, but not before Glendon had been particularly successful.  (Id. Ex. 16 at 10.)  According to a written statement cited by City Defendants, on March 18, Tegler called Waters-Rice to explain why the project had been cancelled, but Waters-

Rice seemed to believe that Tegler had singled out Glendon.  (City Defs.' Ex. 91.)  Then on

March 22, 2005, Tegler testified that she received a call on her cell phone from someone

identifying herself as Mrs. Rice, who called her "a racist and a bigot and a pig."  (City Defs.' Ex.

16 at 25.)  Smith testified that Tegler then came to her upset, told her about the call, and said that

she needed to go home.  (City Defs.' Ex. 14 at 86.)

Smith then called the police to report the call.  (See Pls.' App. 337-38.)  The police came

to the school to meet with Tegler; however, Tegler did not return to school.  The police then went

to her house and discovered her there in a fetal position on the floor with vomit on her.  (City

Defs.' Ex. 10 at 62-63.)  The police transported her to the hospital.  (Id.)

The police obtained Tegler's cell phone later that day and determined that the last call she

had received was at approximately 8:01 that morning and that it was not from Waters-Rice.  (See

City Defs.' Ex. 10 at 66.)  Tegler told Felsing that she just wanted the incident to go away, and

the police returned her cell phone to her.  (Id.; id. Ex. 17 at 164.)  Tegler's cell phone allegedly

disappeared after that, but it was eventually located in pieces in a toilet at the school. (Id. 168-

69.)

### J.    Procedural History

Plaintiffs filed their complaint on November 1, 2004, against the City of Sea Isle City, the

Sea Isle City Police Department, Sea Isle City Board of Education, Sea Isle City School,

Davenport, Gansert, James Innanone, Kennedy, Rodger, Smith, and Jane and John Does 1-5.  Sea

Isle City School, Sea Isle City Board of Education, Davenport, Rodger, and Joann Smith

("School Defendants") subsequently answered and filed a counterclaim alleging that Plaintiffs'

action was frivolous and in bad faith.  On July 17, 2006, Plaintiffs filed their Amended

12

Complaint, adding Felsing and Tegler as defendants, and claims for retaliation.  James Innanone was dismissed from the suit by stipulation on July 20, 2007.

Davenport moved for summary judgment on July 26, 2007.  City Defendants filed their motion for summary judgment on July 31, 2007, as did Tegler.  Felsing moved for summary judgment on August 1, 2007.  School Defendants so moved on August 31, 2007, and lastly, Kennedy filed his motion for summary judgment on September 6, 2007.

## II.   STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the Court weighs the evidence presented by the parties, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  Celotex, 477 U.S. at 330.  The moving party may satisfy this burden by either (1) submitting affirmative evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case.  Id. at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e)  To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to

13

material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).

Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to

establish the existence of [every] element essential to that party's case, and on which that party

will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322.

## III.   DISCUSSION

Plaintiffs brought claims against Defendants under 42 U.S.C. § 1983 and § 1985, the New

Jersey Constitution, the New Jersey Law Against Discrimination ("NJLAD"), and the common

law tort of malicious prosecution.  The Court will address the each of Plaintiffs' claims in turn,

but will start with individual Defendants' qualified immunity defense to Plaintiffs' federal

constitutional claims.

### A.   Qualified Immunity

City Defendants, School Defendants, Felsing, and Davenport seek shelter from Plaintiffs'

§ 1983 claims under the doctrine of qualified immunity.  Section 1983 provides a remedy for acts

that violate the United States Constitution committed by a person acting under color of state law.

Government officials who are accused of violating a person's constitutional rights while

performing discretionary functions are entitled to qualified immunity.  Qualified immunity

shields officials "from liability from civil damages insofar as their conduct does not violate

clearly established statutory or constitutional rights of which a reasonable person would have

known." <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982).  This analysis is two-fold.  First, the

court is to assess whether the facts as adduced by the plaintiff amount to a constitutional

violation.  If this test is met, the court then determines whether the right is "clearly established."

<u>Saucier v. Katz</u>, 533 U.S. 194, 200-01 (2001); <u>Kopec v. Tate</u>, 361 F.3d 772, 775-76 (3d Cir.

2004).  In other words, before engaging in a determination of whether a right is clearly

established, the court must first determine whether a constitutional violation has occurred,

because "[i]f the plaintiff fails to make out a constitutional violation, the qualified immunity

inquiry is at an end; the [official] is entitled to immunity."  Id. at 776 (quoting Bennett v.

Murphy, 274 F.3d 133, 136 (3d Cir. 2002)).  As to the second prong of the qualified immunity

analysis, the Supreme Court has determined that such a finding hinges on "whether it would be

clear to a reasonable [official] that his conduct was unlawful in the situation he confronted."

Saucier, 533 U.S. at 202.  The first step of the qualified immunity analysis involves an evaluation

of whether Plaintiffs set forth constitutional violations; as a result, the Court simultaneously

determines whether summary judgment is appropriate.

**B.      Fourth Amendment Violations**

Plaintiffs allege violations of the Fourth Amendment stemming from Waters-Rice's arrest

and the criminal charges brought against her, as well as from the warrantless search of her home.

The Fourth Amendment provides: "The right of the people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures, shall not be violated, and no

Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly

describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend.

IV.

i.      Felsing's Statute of Limitations Defense

Felsing argues that he is entitled to summary judgment because Plaintiffs' claims against

him are barred by the statute of limitations.  Plaintiffs counter that they preserved their ability to

add Felsing as a defendant by employing New Jersey's fictitious party rule.

Actions brought under § 1983 are subject to statute of limitations applicable to personal injury in state in which claim accrued. Cito v. Bridgewater Twp. Police Dep't, 892 F.2d 23, 25 (3d Cir. 1989). "Every action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this State shall be commenced within 2 years next after the cause of any such action shall have accrued." N.J. Stat. Ann. 2A:14-2. Waters-Rice's claims for false arrest and unlawful search accrued on November 24, 2003, the date of her arrest and the alleged search of her home. See Wallace v. Kato, 127 S. Ct. 1091, 1094 (2007). Her claim for malicious prosecution accrued the date the case against her was dismissed, December 17, 2003. See Heck v. Humphrey, 512 U.S. 477, 489 (1994). Therefore, the statute of limitations for her claims expired on November 24, 2005 and December 17, 2005, respectively. Plaintiffs amended their complaint to name Felsing as a defendant on July 17, 2006.

Under Federal Rule of Civil Procedure 15(c), however, an amendment to a complaint will be permitted if it can "relate back" to the date of the original pleading under state law. Fed. R. Civ. P. 15(c)(1) ("An amendment to a pleading relates back to the date of the original pleading when . . . the law that provides the applicable statute of limitations allows relation back."). New Jersey law provides that amendments adding a defendant will relate back to the original pleading if the plaintiff properly pleads a fictitious name prior to the expiration of the limitations period. N.J.R. 4:26-4. This fictitious party rule permits a plaintiff to hold a place for a defendant whose identity he cannot yet ascertain. This rule is not always available, however. To invoke the rule, the fictitious name in the complaint must have been accompanied by an appropriate description sufficient to identify the defendant. See Rutkowski v. Liberty Mut. Ins. Co., 506 A.2d 1302, 1306 (N.J. Super. Ct. App. Div. 1986). In addition, the plaintiff must have used due diligence to

try to determine the defendant's identity before and after filing the complaint.  See Matynska v. Fried, 811 A.2d 456, 457 (2002).  Moreover, the application of the rule must not prejudice the defendant.  See Mears v. Sandoz, 693 A.2d 558, 563-64 (N.J. Super. Ct. App. Div. 1997).

### a.    Appropriate Description

In the original complaint, Plaintiffs identified John and Jane Does 1-5 as "individuals whose names are not known (including police officers and employees of the School), and who conspired with one or more of the other Defendants and/or engaged in similar wrongdoing against the plaintiffs."  This description is not an overly general placeholder.  The Complaint indicates that the missing parties are Sea Isle City police officers who engaged in wrongdoing similar to that alleged against the named parties, including Gansert, whom Felsing was with during some of the key events alleged in Plaintiffs' case.

### b.    Due Diligence

Felsing alleges that Plaintiffs could have ascertained Felsing's identity within the statute of limitations based on three sources: Kearney's affidavit concerning Rice's welfare (Felsing's Ex. F), which purportedly attached a report identifying Felsing; Felsing's Supplemental Investigation Report of November 24, 2003 (id. Ex. V); and the Officer Information Form Felsing generated regarding the events of November 24 (id. Ex. T.)  Plaintiffs respond that Kearney's Affidavit does not in any way evince Felsing's identity, nor has Felsing adduced any evidence showing that Plaintiffs had the police report in 2003.  Plaintiffs also argue that they did not know they had a claim against Felsing until January and February of 2006 when they learned from deposing Gansert and Felsing that Felsing supplied the false statement in his Officer Information Form that Waters-Rice intended to come back to the school and do bodily harm.

17

There is no precise definition for what due diligence requires; the meaning must be determined based on the facts of each particular case and with respect to prior case law. DeRienzo v. Harvard Indus., Inc., 357 F.3d 348, 354 (3d Cir. 2004).  With respect to the search of Plaintiffs' home, Felsing's identity should have been evident to Plaintiffs based on his November 24, 2003 Supplementary Investigation Report, which indicated Felsing's involvement. Through reasonable diligence, Plaintiffs could have ascertained which police officers entered her home on November 24 and therefore were the ones who allegedly emptied her drawers.

With regard to Waters-Rice's claims for false arrest and malicious prosecution, however, Plaintiffs did satisfy their due diligence obligation.  Plaintiffs did not learn that the misstatement in the Officer Information Statement was Felsing's fault until they deposed Gansert and Felsing in early 2006.  Plaintiffs amended their complaint to add Felsing on July 17, 2006, five months later.  Before then, Plaintiffs did not know the nature of Felsing's involvement with Waters-Rice's arrest and prosecution.  Accordingly, the Court finds that Plaintiffs' actions were enough to satisfy the due diligence requirements of N.J.R. 4:26-4 for her false arrest and malicious prosecution claims against Felsing but not for the unlawful search claim.

c.      Prejudice to Defendant

Although it is not explicitly enumerated as a factor under N.J.R. 4:26-4, the Court should consider whether a defendant has suffered prejudice or relied in some way on the expiration of the limitations period.  Mears, 693 A.2d at 562.  Some prejudice to the defendant will not automatically determine the outcome when "[j]ustice impels strongly towards affording the plaintiffs their day in court on the merits of their claim."  Farrell v. Votator Div. of Chemtron Corp., 299 A.2d 394, 400 (N.J. 1973).  Prejudice here is negligible.  Felsing has already been

18

defending himself and will continue to do so on those claims against him not subject to summary judgment.  In addition, because Plaintiffs named Felsing's partner Gansert and expressed the intention to name other police officers who were involved in the alleged incidents, Felsing should have been aware at the time the original Complaint was filed that he would be brought into the case.  Accordingly, summary judgment is warranted only on Plaintiffs' unlawful search claim against Felsing.

ii.    <u>False Arrest</u>

City Defendants argue that Waters-Rice's arrest warrant and the complaint underlying the warrant were sufficient and reflected a substantial basis for concluding that probable cause existed.  City Defendants also argue that when Gansert obtained the warrant, he only used his own complaint, not the Officer's Information Form containing Felsing's false statement.  Felsing argues that his statement that Waters-Rice intended to come back to the school to harm school personnel was not material to the issuance of the warrant, and that even absent that false statement, there was probable cause for Waters-Rice's arrest.  Plaintiffs contend, and the Court agrees that there is evidence suggesting that Gansert and Felsing made up facts to support the arrest warrant, and that a jury could readily conclude that the police lacked probable cause to arrest Waters-Rice following her meeting with school officials on November 24.

An arrest made without probable cause creates a cause of action for false arrest under 42 U.S.C. § 1983.  <u>Dowling v. City of Phila.</u>, 855 F.2d 136, 141 (3d Cir. 1988).  Challenges to the validity of a warrant based on allegations that the accompanying affidavit contains material false statements are governed by <u>Franks v. Delaware</u>, 438 U.S. 154 (1978); <u>see also</u> <u>United States v. Carter</u>, 756 F.2d 310, 313 (3d Cir. 1985) (applying reasoning of Franks to arrest warrants).

a.     *Material False Statements*

Where a magistrate has issued a warrant, the supporting affidavit is entitled to a
presumption of validity.  Franks, 438 U.S. at 171.  The party disputing the veracity of the warrant
application can challenge the validity of the warrant by making a substantial preliminary showing
that the affiant deliberately or recklessly included in the underlying affidavit falsehoods
concerning material facts necessary to the determination of probable cause.  Id. at 155-56.  If the
defendant establishes falsity by a preponderance of the evidence, the false statements will be
stricken from the affidavit and the court will determine whether the information remaining in the
affidavit is sufficient to support a finding of probable cause.  Id.  Courts have employed the
Franks analysis in § 1983 claims for Fourth Amendment violations.  Jones v. Town of Seaford,
Del., 661 F. Supp. 864, 873 (D. Del. 1987) (citing Krohn v. United States, 742 F.2d 24, 26 (1st
Cir. 1984)).

Here, Plaintiffs have make a substantial showing that Gansert and Felsing deliberately or
recklessly included in the underlying affidavit falsehoods concerning material facts necessary to
the determination of probable cause.  It is not clear from the facts exactly what information
Gansert conveyed in his telephone conversation with the judge.  (See City Defs.' Reply 11.)
Gansert testified at his deposition that neither Smith nor Fiedler told them that Waters-Rice
intended to "come back and do bodily harm to them," as he swore in the complaint from which
the warrant issued.  Furthermore, both Fiedler and Waters-Rice testified that Waters-Rice's
purportedly threatening comment was directed to Shaffer, not "directly to the Sea Isle City Public
School Staff" as stated by Gansert in his complaint.  Also, Fiedler and Smith both testified that
they never told the police about a specific threat involving stabbing, which could lead a jury to

20

question the veracity of the statement in the complaint that Waters-Rice said "she was going to

commit violence upon the staff, specifically by stabbing them."  (See Pls.' App. 94, Fiedler Dep.

37-38; id. 216, Smith Dep. 59-60.)  The number of statements that are admittedly or potentially

false support Plaintiffs' contention that the inclusion of those statements was more than mere

inadvertence and instead reflected deliberateness or recklessness on the part of Gansert and/or

Felsing.

b.    <em>Probable Cause</em>

Waters-Rice was charged with the crime of third degree terroristic threats.  In New

Jersey,

> [a] person is guilty of a crime of the third degree if he threatens to commit any
> crime of violence with the purpose to terrorize another or to cause evacuation of a
> building, place of assembly, or facility of public transportation, or otherwise to
> cause serious public inconvenience, or in reckless disregard of the risk of causing
> such terror or inconvenience.

N.J. Stat. Ann. 2C:12-3(a).  Given the evidence of false statements in the complaint underlying

the warrant, the Court concludes that Plaintiffs have submitted sufficient evidence to raise a

genuine issue of material fact as to whether Sea Isle City police had probable cause to arrest

Waters-Rice.

The United States Supreme Court has defined "probable cause" as "facts and

circumstances 'sufficient to warrant a prudent man in believing that the (suspect) . . . committed .

. . an offense.'"  Gerstein v. Pugh, 420 U.S. 103, 111 (1975) (quoting Beck v. Ohio, 379 U.S. 89,

91 (1964)).  While "[p]robable cause to arrest requires more than mere suspicion[,] . . . it does

not require that the officer have evidence sufficient to prove guilt beyond a reasonable doubt."

Orsatti v. N.J. State Police, 71 F.3d 480, 482-83 (3d Cir. 1995).  The Third Circuit instructs that

21

courts should apply a "common sense approach," based on the totality of the circumstances, to

determine whether there was probable cause to arrest.  Paff v. Kaltenbach, 204 F.3d 425, 436 (3d

Cir. 2000).  When determining whether an officer had probable cause for an arrest, a court

reviewing the "totality of the circumstances" must "examine the events leading up to the arrest,

and then decide 'whether these historical facts, viewed from the standpoint of an objectively

reasonable police officer, amount to' probable cause."  Maryland v. Pringle, 540 U.S. 366, 371

(2003) (quoting Ornelas v. United States, 517 U.S. 690, 696 (1996)).  Generally, the existence of

probable cause is a factual issue.  Groman v. Township of Manalapan, 47 F.3d 628, (3d Cir.

1995).

     In this case, a jury could accept the accounts of the meeting as recited by four of the five

people who were present—that the conversation concluded with everyone thinking the matter

was resolved and that Waters-Rice made a comment to her friend about what would have

happened if it had not been resolved.  (Pls.' App. 92, 94, Fiedler Dep. 19, 37-38; id. 273, Waters-

Rice Dep. 357; id. 187, Rice Dep. 128-30; id. 209, Shaffer Dep. 52.)  Waters-Rice stated that her

comment was intended as a joke, and Shaffer recalls all present laughing.  Stripped of the

potentially false statement that Waters-Rice directly threatened Fiedler and Smith and the

admittedly false statement that Waters-Rice intended to return to the school to do bodily harm to

school officials by stabbing them, a jury could reasonably find that the facts, viewed from the

standpoint of an objectively reasonable police officer, did not amount to probable cause that

Waters-Rice intentionally or recklessly "threaten[ed] to commit [a] crime of violence with the

purpose to terrorize another."  Therefore, the Court finds that Plaintiffs have raised genuine

issues for trial as to whether Defendants' conduct towards Waters-Rice violated her Fourth

Amendment right to be free from false arrest.

Furthermore, Gansert and Felsing are not entitled to qualified immunity on Plaintiffs' false arrest claim. The facts as adduced, are adequate to establish a Fourth Amendment violation. Based on established Fourth Amendment principles, it would have been clear to a reasonable detective that conveying falsehoods to a judge in obtaining an arrest warrant was unlawful. See Lippay v. Christos, 996 F.2d 1490, 1504 (3d Cir. 1993) (holding police officer not entitled to qualified immunity where he submitted affidavit in support of arrest warrant containing statements he knew to be false or would have known to be false if he had not recklessly disregarded the truth).

      iii.    Malicious Prosecution

Plaintiffs also allege that Defendants deprived Plaintiffs of their federal constitutional right to be "free from . . . malicious prosecution" pursuant to 42 U.S.C. § 1983. Felsing argues that Plaintiffs have not demonstrated a sufficient deprivation of liberty to sustain a malicious prosecution claim under the Fourth Amendment. City Defendants rely on their contention that there was probable cause to arrest Waters-Rice. Smith argues she is entitled to qualified immunity on the malicious prosecution claim.

"To prove malicious prosecution under [§] 1983 when the claim is under the Fourth Amendment, a plaintiff must show that: (1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." Johnson v. Knorr, 477 F.3d 75,

81-82 (3d Cir. 2007) (citing Estate of Smith v. Marasco, 318 F.3d 497, 521 (3d Cir. 2003)).

It is undisputed that Gansert, Felsing, and Smith are responsible for initiating a criminal proceeding against Waters-Rice and that the criminal proceeding ended in her favor when the prosecutor threw out the charges.  In addition, the Court has already determined that questions of fact exist regarding whether the proceeding was initiated without probable cause.  Furthermore, based on the evidence of discriminatory animus on the part of Defendants—deciding to press charges when evidence suggests no crime was actually committed—a jury could certainly conclude that Defendants acted with the requisite malicious intent.

Finally, Plaintiffs have set forth facts showing that Waters-Rice suffered a deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding.  In response to a warrant issued for her arrest, Waters-Rice was forced to report to the police station and undergo processing, which qualifies as a seizure as a consequence of a legal proceeding.  Cf. Laufgas v. Patterson, 206 F. App'x 196, 197 (3d Cir. 2006) (holding that arrest and subsequent two hour detention amounted to a seizure within the meaning of the Fourth Amendment but that malicious prosecution claim failed because arrest was not pursuant to a warrant and occurred prior to filing criminal complaint).  Therefore, Plaintiffs have offered ample evidence to make out a Fourth Amendment claim for malicious prosecution.

What is more, Gansert, Felsing, and Smith are not immune from Plaintiffs' claim of malicious prosecution.  A reasonable detective would have recognized that proceeding with criminal charges based on falsified information was unlawful.  See Molina v. City of Lancaster, 159 F. Supp. 2d 813, 820 (E.D. Pa. 2001) (citing Orsatti, 71 F.3d at 484) (stating right to be free from the fabrication of evidence, falsifying documents, and malicious prosecution is clearly

established).  Such law applies with equal force to Smith, who evidence suggests, may have

contributed false statements to the police reports, in addition to fabricating evidence.  See id.  As

a result, Defendants are not entitled to summary judgment on Plaintiffs' Fourth Amendment

malicious prosecution claim.

> iv.   Municipal Liability

City Defendants argue that Plaintiffs cannot prove that Sea Isle City had an

unconstitutional policy or custom that violated Plaintiffs' rights, and that even if they could, they

have not linked the alleged custom to Sea Isle City, its police department, or any individual

officers.  Plaintiffs need only set forth specific facts showing that there is a genuine issue for trial

on the issue of municipal liability, however, and this they have done.

Local government units are not liable under § 1983 solely on a theory of respondeat

superior.  See City of Oklahoma City v. Tuttle, 471 U.S. 808, 824 n.8 (1985); Monell v. N.Y.

City Dep't of Soc. Servs., 436 U.S. 658, 690-91, 694 (1978) (municipal liability attaches only

"when execution of a government's policy or custom, whether made by its lawmakers or by those

whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained

of); Lloyd v. Borough of Stone Harbor, 432 A.2d 572, 583 (N.J. Super. Ct. Ch. Div. 1981)

(adopting Monell holding for municipal liability under the New Jersey Constitution).  "A

defendant in a civil rights action must have personal involvement in the alleged wrongs, liability

cannot be predicated solely on the operation of respondeat superior.  Personal involvement can

be shown through allegations of personal direction or of actual knowledge and acquiescence."

Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988) (citations omitted).

To establish municipal liability under § 1983, "a plaintiff must show that an official who

25

has the power to make policy is responsible for either the affirmative proclamation of a policy or acquiescence in a well-settled custom." Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990), A plaintiff must demonstrate that, through its deliberate conduct, the municipality was the moving force behind the plaintiff's injury. Monell, 436 U.S. at 689. A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues a final proclamation, policy or edict." Kneipp v. Tedder, 95 F.3d 1199, 1212 (3d Cir. 1996) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986) (plurality opinion)). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." Bd. of County Comm'rs of Bryan County, Oklahoma v. Brown, 520 U.S. 397, 404 (1997).

Hence, there are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983. The first is where "the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." The second occurs where "no rule has been announced as policy but federal law has been violated by an act of the policymaker itself." Finally, a policy or custom may also exist where "the policymaker has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government 'is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.'" Natale v. Camden County Corr. Facility, 318 F.3d 575, 584 (3d Cir. 2003) (footnote and citations omitted).

26

Here, Plaintiffs have adduced sufficient evidence from which a jury could decide that it was the custom of Sea Isle City, as expressed through its police, to violate the Fourth Amendment rights of its few black residents.  Specifically, Plaintiffs have evidence that its police made statements that were either intentionally or recklessly false for the purpose of arresting and prosecuting an African American resident of the city.  When coupled with facts suggesting that Sea Isle City police routinely patrolled outside Plaintiffs' home, directed racial slurs at Plaintiffs, threatened Plaintiff's son with a gun based on little to no provocation, and initially assumed Waters-Rice was hired help in her own home, a jury could find that Sea Isle City had a custom of race discrimination that while not formally approved by a policymaker, was "so widespread as to have the force of law."  See Bd. of County Comm'rs of Bryan County, Oklahoma, 520 U.S. at 404.  A jury could further conclude that the custom of race discrimination was the moving force behind the violations of Plaintiffs' Fourth Amendment rights.

> v.    Warrantless Search

Plaintiffs allege that their Fourth Amendment rights were violated when Felsing and another police officer, Officer LaRosa, looked in closets and opened drawers in two bedrooms in Plaintiffs' home.  Although LaRosa is not named in the suit and Felsing is entitled to summary judgment on Plaintiffs' unlawful search claim, Plaintiffs also allege that Sea Isle City is liable for the Fourth Amendment violation.  As a result, the Court will analyze whether Plaintiffs have established a genuine issue of material fact concerning whether they were victims of an unlawful search.

"[S]earches and seizures inside a home without a warrant are presumptively unreasonable."  Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (citations and internal

quotation marks omitted).  In the absence of exigent circumstances, the "firm line at the entrance

to the house . . . may not reasonably be crossed without a warrant," even if the police have

probable cause that the person committed a crime.  Payton v. New York, 445 U.S. 573, 590

(1980).  The scope of any search must be "strictly tied to and justified by the circumstances

which rendered its initiation possible."  Chimel v. California, 395 U.S. 752, 762 (1969).

City Defendants do no more than attack the credibility of the evidence relating to the

alleged search of Plaintiffs' home, which is not enough to merit summary judgment.  It is

undisputed that the police did not have a search warrant when they went to Plaintiffs' home to

execute the arrest warrant.  Luis Waters testified that police walked in the house without

knocking and asked if Waters-Rice was at home.  (Pls.' App. 248, Waters Dep. 38.)  He testified

further that the police told him to stay where he was in the living room and proceeded to go

through the house.  (Id. 42.)  When Waters-Rice and Shaffer returned home that day, they

testified that they found their clothing on the floor of their bedrooms next to open drawers and

closets.  (Id. 279, Waters-Rice Dep. 509-09, 530-36; id. 211, Shaffer Dep. 62.)  These facts

constitute circumstantial evidence from which a jury could infer that Felsing and LaRosa looked

in Plaintiffs' closets and drawers in violation of their Fourth Amendment rights.

There is no evidence linking Defendants Gansert or Kennedy to the alleged unlawful

search.  The uncontroverted testimony establishes that Gansert remained outside the house.  (See

id. 71, Evans 65; City Defs.' Ex. 17 at 63.)  Moreover, there is no evidence that Kennedy even

went to Plaintiffs' residence that day or knew about the search.  Accordingly, Gansert and

Kennedy are entitled to summary judgment to the extent that Plaintiffs allege they are liable for

violating their Fourth Amendment right to be free from unreasonable searches.

C.      **Fourteenth Amendment Violations**

Plaintiffs maintain that Defendants violated Plaintiffs' Fourteenth Amendment rights to equal protection and due process.  They allege generally that it is "a matter of common sense that white residents of Sea Isle City were not called racially derogative names by the white police officers and school personnel, not assumed to be maids in their own homes, not falsely arrested and not subjected to the variety of abuses that the plaintiffs were forced to endure."  In addition, Plaintiffs allege two specific ways in which Defendants denied them equal protection and due process pursuant to the Fourteenth Amendment: by contributing to a hostile school environment for Glendon and Anequa and by subjecting Plaintiffs to discriminatory police surveillance.

The Equal Protection Clause provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  This is not a command that all persons be treated alike, but rather a direction that all persons similarly situated be treated alike.  See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  "The central purpose of the Equal Protection Clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race."  Washington v. Davis, 426 U.S. 229, 239 (1976), or any other suspect classification.  To make an equal protection claim, a plaintiff must prove that the defendants' actions (1) had a discriminatory effect and (2) were motivated by a discriminatory purpose.  Arlington Heights v. Metro. Housing Dev. Corp., 429 U.S. 252, 264-66 (1977).

    i.      Alleged Violations

        a.      *Rodger*

Rodger admits that on November 21, 2003, she excluded Anequa, the only black student

29

in the class, from joining the other students in practicing for the play.  (Pls.' App. 194-95, Rodger

Dep. 32-33.)  Anequa testified that Rodger's explanation for this exclusion was that Anequa is

black and "black people don't celebrate Christmas."  (Id. 136a, Anequa Dep. II 110.)  Therefore,

Plaintiffs have produced evidence that Rodger engaged in intentional invidious discrimination

based on race.  The veracity of Defendants' explanation that Rodger mistook Anequa for another

black student requires a credibility determination that only a jury can make.  In addition, Rodger

is not entitled to qualified immunity, because these facts rise to the level of a constitutional

violation and also is violative of a clearly established constitutional right to equal protection.  See

Mitchum v. Foster, 407 U.S. 225, 238 (1972) (stating equal protection under the law is clearly

established); Brown v. Bd. of Educ., 347 U.S. 483, 493-94 (1954) (holding that segregation

deprived black students of equal educational opportunities).

> b.    Davenport

Plaintiffs allege that Davenport discriminated against Anequa when she stopped in her

classroom during the middle of the 2003-2004 school year and commented that it smelled like an

animal.  Anequa perceived this comment to be motivated by racial animus; however, that

subjective perception alone is not enough to establish that Davenport violated Anequa's

Fourteenth Amendment rights to equal protection.  As a result, the Court will grant Davenport

summary judgment on Plaintiffs' Fourteenth Amendment claim.

> c.    Smith

Plaintiffs set forth a Fourteenth Amendment claim against Smith.  They offer evidence

that Smith used racial slurs during a meeting with Waters-Rice, called the police to report a

supposed terroristic threat made by her, conspired to file a false police report against her, and

failed to stop eighteen months of abuse of Glendon by his peers.  These allegations provide a

basis for a reasonable jury to find that Smith's actions had a discriminatory impact on Plaintiffs

and were motivated by a discriminatory purpose.  Smith is not entitled to qualified immunity,

because this evidence rises to the level of a constitutional violation and also is violative of a

clearly established constitutional right to equal protection and due process.  See Mitchum, 407

U.S. at 238; Brown, 347 U.S. at 493-94.

                    d.      Kennedy

        Plaintiffs allege that by failing to give the School Board the entire account of the

incidents of November 24, after Smith only told them that there had been a case of mistaken

identity involving Anequa, Kennedy acquiesced in Smith and those working under her

continuing to mistreat Plaintiffs.  Plaintiffs contend that had he reported the criminal charge of

terroristic threats against Waters-Rice and the subsequent dismissal of those charges by the

prosecutor, the School Board would have been able to monitor the situation and prevent further

harm to Plaintiffs.  Regardless, however, Plaintiffs cannot show that a reasonable school board

member in Kennedy's position would have realized that not augmenting Smith's account of the

events of November 24 would be unlawful.  In fact, Kennedy testified that he made it a practice

not to share information with the School Board that he only knew because he was also Chief of

Police.  Therefore, Kennedy is immune from Plaintiffs' Fourteenth Amendment claim against

him.

                    e.      Felsing and Gansert

        Plaintiffs have shown questions of material fact as to whether Felsing and Gansert acted

with discriminatory intent and had a discriminatory effect when they sought an arrest warrant for

Waters-Rice and persisted in initiating criminal charges against her.  Waters-Rice's right to be

free from false arrest and malicious prosecution due to racial animus was clearly established at

the time of Felsing's and Gansert's actions.  See Mitchum, 407 U.S. at 238; Lippay, 996 F.2d at

1504; Molina, 159 F. Supp. 2d at 820.

<em>f.</em>    <em>Sea Isle City</em>

As with Plaintiffs' Fourth Amendment claims against Sea Isle City, discussed at Section

III.B.iv,  a reasonable jury could also find that Sea Isle City had a custom of depriving black

residents of their rights to due process and equal protection under the law.  Consequently, City

Defendants' motion for summary judgment as to Sea Isle City's liability on Plaintiffs' Fourteenth

Amendment claims will be denied.

ii.    <u>Hostile School Environment</u>

Plaintiffs allege that the actions of School Defendants and Davenport detailed above, as

well as the ongoing verbal and physical abuse Glendon suffered at the hands of his classmates

gave rise to a hostile school environment to which Defendants acquiesced.  Plaintiffs assert that

the affirmative conduct and deliberate indifference on the part of Defendants violated Plaintiffs'

rights to equal protection.  Nevertheless, School Defendants and Davenport are entitled to

qualified immunity on this claim.

While some circuits have recognized a cause of action for hostile educational

environment under the Fourteenth Amendment, see Gant ex rel. Gant v. Wallingford Bd. of

Educ., 195 F.3d 134, 140 (2d Cir. 1999) (recognizing Fourteenth Amendment racial hostility

claim against teachers, administrators, and boards of education, where plaintiff shows deliberate

indifference on the part of the defendants); Murrell v. Sch. Dist. No. 1, 186 F.3d 1238, 1249-51

32

(10th Cir. 1999) (holding that plaintiff states a claim for Fourteenth Amendment violation where school officials "actually knew of and acquiesced in" peer-on-peer sexual harassment), the Third Circuit has not done so.  In D.R. by L.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d 1364 (3d Cir. 1992), the Third Circuit addressed the liability of school teachers and administrators in the context of peer-on-peer sexual harassment and abuse.  There, the court rejected the notion that school teachers and administrators had a special relationship with the plaintiffs during school hours such that they owed the student plaintiffs a constitutional duty to protect them from the misconduct of other students.  Id. at 1369-73.  The D.R. court reasoned that the Fourteenth Amendment does not automatically embrace nonfeasance by school officials in the face of sexual harassment and abuse of a student by other students.  Id. at 1373-76.  Moreover, the court in D.R. found that there was no § 1983 liability where private actors committed the underlying violative acts.

As a result, the acquiescence by school employees in the abuse suffered by Glendon did not amount to a constitutional violation.  Moreover, Glendon did not have a clearly established right to his school's protection.  The Third Circuit has stated that for a public official to be denied qualified immunity, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of preexisting law the unlawfulness must be apparent."  Good v. Dauphin County Soc. Servs. for Children & Youth, 891 F.2d 1087 (3d Cir. 1989).  In light of the preexisting law that confronted the officials at Sea Isle City School, the Fourteenth Amendment did not impose a duty on them to prevent race-based

33

harassment of students by their classmates.  Accordingly, School Defendants and Davenport are entitled to qualified immunity on Plaintiffs' § 1983 claim to the extent that Plaintiffs' rely on misconduct by private actors in creating a racially hostile school environment for Glendon and Anequa.

iii.   <u>Discriminatory Surveillance</u>

To the extent that Plaintiffs seek to hold Kennedy, Gansert, or Felsing liable for Fourteenth Amendment violations stemming from discriminatory surveillance and harassment, those individual Defendants are entitled to summary judgment.  Plaintiffs have offered no facts to link Kennedy, Gansert, or Felsing to the specific incidents of harassment alleged by Plaintiffs. Indeed Defendants highlight testimony by Waters-Rice that neither Kennedy nor Gansert used racial slurs.  (City Defs.' Stmt. of Facts at ¶¶ 235-38, 242, 245, 255.)  Since constitutional liability can only be predicated on personal involvement, and Plaintiffs have not shown any evidence of personal direction or of actual knowledge and acquiescence by Kennedy, Gansert, or Felsing in discriminatory surveillance, they merit summary judgment on Plaintiff's claims against them under the Fourteenth Amendment.  <u>See</u> <u>Rode</u>, 845 F.2d at 1207.  Nevertheless, the evidence of police misconduct may still be relevant to Plaintiffs' claim for municipal liability and § 1985(3) conspiracy.

**D.      Retaliation in Violation of § 1983 and NJLAD**

Plaintiffs allege that school and police officials retaliated against them for filing their lawsuit because Tegler and Smith collaborated to falsely report that Waters-Rice had made a threatening phone call to Tegler and because the police did not elect to press charges against Tegler and Smith.  In addition, Plaintiffs maintain that Davenport's conduct towards Glendon, in

34

removing him from class to talk about the lawsuit and threatening to continue doing so until his mother came to school to discuss the matter, and towards Anequa, in partnering with her in a class activity and repeatedly putting her arm around her, was retaliatory.

A claim for retaliation under § 1983 and the NJLAD requires a plaintiff to demonstrate: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." Thomas v. Independence Twp., 463 F.3d 285, 296 (3d Cir. 2006); see also Hanani v. State of N.J. Dep't of Envtl. Prot., 205 F. App'x 71, 80 (3d Cir. 2006) (stating that elements for retaliation under NJLAD track those of § 1983).

i.      Sea Isle City, Gansert, Kennedy, and Felsing

Plaintiffs do not make out a constitutional violation for retaliation against any of the police Defendants; therefore, they are entitled to qualified immunity. The police are not responsible for any allegedly retaliatory actions towards Plaintiffs. Felsing did respond to Smith's call concerning the supposedly threatening phone call to Tegler, and he proceeded to check on Tegler at her home; however, neither he nor any other Police Defendants filed charges against Waters-Rice as a result. In fact, they believed that Smith and Tegler had invented the story of that Waters-Rice had threatened Tegler. Police Defendants are not liable for retaliation for opting not to press charges against Smith and Tegler for filing a false police report. See Manna v. Twp. of Fairfield, Civ. No. 04-1430, 2007 WL 3231894, at *2-3 (D.N.J. October 30, 2007) (deciding that defendants' failure to investigate allegedly wrongful acts reported by plaintiffs does not affect plaintiffs' exercise of free speech).

Furthermore, Plaintiffs have not offered enough evidence from which a reasonable jury could conclude that Sea Isle City had a policy or custom of retaliating for filing lawsuits against it, since Plaintiffs have not established that any of its agents engaged in retaliatory activity. Consequently, Sea Isle City, Gansert, Kennedy, and Felsing are entitled to summary judgment on Counts III and VI of Plaintiffs' Amended Complaint.

        ii.      <u>Sea Isle City School, Smith, Tegler, and Davenport</u>

Plaintiffs do, however, establish questions of material fact as to whether Sea Isle City School, Smith, Tegler, and Davenport retaliated against them for exercising their rights to access the courts.  First, Plaintiffs engaged in constitutionally protected conduct by filing a lawsuit.  In addition, a jury could find that filing a false police report accusing a person of a crime they did not commit qualifies as retaliatory conduct sufficient to deter a person of ordinary firmness from exercising her constitutional rights.  A jury could draw the same conclusion about a teacher threatening to pull a child from class every day until his mother comes to school to speak with school officials.  There is also a question of fact regarding whether a school official insisting on partnering with a second-grader during a school activity and the official repeatedly putting her arm around the student would be retaliatory as to a second-grader of ordinary firmness.

Finally, Plaintiffs have offered enough evidence of a causal link between Plaintiffs' lawsuit and the retaliatory action.  Davenport removing Glendon from class evinces an direct causal link because her threat to continue doing so specifically related to the lawsuit.  Based on that explicit causal link, a jury could reasonably infer that Davenport's conduct toward Anequa was similarly connected to the lawsuit.  As for the actions of Smith and Tegler, which followed approximately four months after the suit was filed, a jury could reasonably surmise that they took

advantage of the cancellation of Tegler's class project to manufacture another "threat" by Waters-Rice.

Therefore, Plaintiffs have set forth a constitutional violation, and the Court must determine whether these Defendants are entitled to qualified immunity.  In the District of New Jersey, "there is a well-established right of a citizen to be free from retaliation for exercising one's right to free speech."  Brennan v. Kulick, Civ. No. 01-3837, 2007 WL 2916519, at *2 (D.N.J. October 05, 2007) (citing Downey v. Coal. Against Rape & Abuse, Inc., 143 F. Supp. 2d 423, 449 (D.N.J. 2001)).  Given this state of the law at the time of Defendants' conduct, Smith, Tegler, and Davenport are not entitled to qualified immunity, and their motion for summary judgment on Counts III and VI of Plaintiffs' Amended Complaint will be denied.

**E.      Conspiracy in Violation of 42 U.S.C. § 1985**

Section 1985(3) permits an action to be brought by one injured by a conspiracy formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws."  42 U.S.C. § 1985(3).  To prove that Defendants conspired to violate their civil rights, in violation of 42 U.S.C. § 1985(3), Plaintiffs must prove the existence of (1) a conspiracy motivated by invidious discriminatory animus, (2) for the purpose of depriving them, either directly or indirectly, of the equal protection of the laws, (3) that there was an act in furtherance of the conspiracy, and (4) that she was, as a result, injured in her person or deprived of any right or privilege of a citizen of the United States.  See Farber v. City of Paterson, 440 F.3d 131, 134 (3d Cir. 2006).

To determine whether a conspiracy existed, the Court must look to state law.  Under New Jersey law, the elements of a civil conspiracy are "(1) a combination of two or more persons; (2)

37

a real agreement or confederation with a common design; (3) the existence of an unlawful

purpose to be achieved by unlawful means; and (4) special damages." <u>Farris v. County of</u>

<u>Camden</u>, 61 F. Supp. 2d 307, 330 (D.N.J. 1999).  An agreement can be shown by direct or

circumstantial evidence.  <u>Adams v. Teamsters Local 115</u>, 214 F. App'x 167, 172 (3d Cir. 2007).

To sustain an action for civil conspiracy "a plaintiff must also point to (1) an overt act of one or

more of the conspirators in furtherance of the conspiracy; and (2) consequential damage to the

rights of another, of which the overt act is the proximate cause." <u>Farris</u>, 61 F. Supp. 2d at 330.

"The question whether an agreement exists should not be taken from the jury in a civil

conspiracy case so long as there is a possibility that the jury can 'infer from the circumstances

[that the alleged conspirators] had a meeting of the minds and thus reached an understanding' to

achieve the conspiracy's objectives." <u>Morgan v. Union County Bd. of Chosen Freeholders</u>,

633 A.2d 985, 998 (N.J. Super. Ct. App. Div. 1993).

      In this case, Plaintiffs have specifically identified the members of the alleged conspiracy;

they have proffered facts from which a jury could infer a meeting of the minds occurred among

Defendants; and they have presented evidence that they were discriminated against on the basis

of race and denied due process and equal protection of the law in furtherance of the alleged

conspiracy.  <u>Cf. Dunkel v. Dunkel</u>, Civ. No. 93-1264, 1993 WL 548282 (E.D. Pa. December 30,

1993) (dismissing plaintiff's § 1985(3) claim because of lack of factual specificity as to requisite

elements).  Plaintiffs adduce facts to support that Defendants were part of a conspiracy insofar as

they participated in and/or condoned a pattern of racially motivated misconduct, which led to

Plaintiffs' constitutional injuries.  As a result, Defendants are not entitled to summary judgment

on Plaintiffs' § 1985 claim.

**F.      New Jersey Constitution**

Unlike violations of the United States Constitution, which are actionable through § 1983, the New Jersey Constitution itself provides a remedy for violations of its provisions.  <u>Scully v. Borough of Hawthorne</u>, 58 F. Supp. 2d 435, 459 (D.N.J. 1999).  Plaintiffs allege state constitutional violations of the guarantees in the New Jersey Constitution at Article 1, Paragraphs 1 and 5 to equal protection of the laws, and in Article 1, Paragraph 6 to free speech.  As the parties have cited no authority nor otherwise suggested that a court's analysis of claims brought pursuant to the New Jersey Constitution for equal protection and retaliation are any different than the analysis of these same claims brought pursuant to the United States Constitution, this Court will rely on the same reasoning and reach the same outcomes as in sections III.B-C above in deciding Defendants' motions for summary judgment as to Plaintiffs' claims brought pursuant to the New Jersey Constitution.

**G.      New Jersey Law Against Discrimination**

The NJLAD provides in relevant part: "All persons shall have the opportunity to obtain . . . all the accommodations, advantages, facilities, and privileges of any place of public accommodation . . . without discrimination because of race . . . This opportunity is recognized as and declared to be a civil right."  N.J. Stat. Ann. § 10:5-4.  The statute further imposes liability on any person who "aid[s], abet[s], incite[s], compel[s], or coerce[s] the doing of any of the acts forbidden under this act, or [who] attempts to do so."  § 10:5-12(e).

          i.      <u>Sea Isle City School</u>

School Defendants argue that Sea Isle City School and Sea Isle City Board of Education are agencies of the State of New Jersey and thus, Plaintiffs' NJLAD claims are barred by the

Eleventh Amendment.  The Court concludes otherwise.

The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by Citizens or Subjects of any Foreign State."  As a general proposition, a suit by private parties seeking to impose a liability that must be paid from public funds in a state treasury is barred from federal court by the Eleventh Amendment, unless Eleventh Amendment immunity is waived by the state itself or by federal statute.  See, e.g., Edelman v. Jordan, 415 U.S. 651, 663 (1974).  The Eleventh Amendment protects states and their agencies and departments from suit in federal court regardless of the type of relief sought.  See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984). Similarly, absent consent by a state, the Eleventh Amendment bars federal court suits for money damages against state officers in their official capacities.  See Kentucky v. Graham, 473 U.S. 159, 169 (1985).  Section 1983 does not override a state's Eleventh Amendment immunity.  See Quern v. Jordan, 440 U.S. 332, 342 (1979).

Counties, municipalities, and political subdivisions of a state are not protected by the Eleventh Amendment.  See Mt. Healthy, 429 U.S. at 280.  Courts usually find school boards and school districts to be such political subdivisions, not entitled to immunity.  See, e.g., id. at 280-281; Febres v. Camden Bd. of Educ., 445 F.3d 227, 229 (3d Cir. 2006).  Nevertheless, in some cases, such entities are determined to be "arm[s] of the State partaking of the State's Eleventh Amendment immunity."  Febres, 445 F.3d at 229 (quoting Mt. Healthy, 429 U.S. at 280).  In deciding into which category a school district or school board falls, a court must apply the following three-part test: (1) whether the payment of the judgment would come from the

40

state, (2) what status the entity has under state law, and (3) what degree of autonomy the entity

has.  Fitchik v. N.J. Transit Rail Operations, Inc., 873 F.2d 655, 659 (3d Cir. 1989) (en banc).

School Defendants have not shown that they are entitled to Eleventh Amendment

immunity as a matter of law.  They have not provided any evidence regarding how state law

treats the Sea Isle City Board of Education generally, whether the Board can sue or be sued in its

own right, whether the Board is separately incorporated, or whether it is immune from state

taxation, all of which are considered subfactors relevant to assessing a Board's legal status under

state law.  Febres, 445 F.3d at 230.  Furthermore, New Jersey state law generally treats school

boards as separate political subdivisions.  See N.J. Stat. Ann. § 18A:10-1; Otchy v. Elizabeth Bd.

of Educ., 737 A.2d 1151, 1157 (N.J. 1999) (noting that under state law a school board is a

distinct legal entity, which, for example, may hold property in its name).  This Court is left to

assume that the general rule in New Jersey applies to the Sea Isle City School Board; therefore,

the School Board is not immune.

ii.      Hostile School Environment

Plaintiffs urge the Court to recognize their claim for hostile school environment under the

NJLAD.  Neither School Defendants nor Davenport specifically address Plaintiffs' hostile school

environment claim and apparently do not oppose the recognition of such a claim based on the

New Jersey Supreme Court's recent holding on the subject.

In L.W. ex rel. L.G. v. Toms River Regional Schools Board of Education, 915 A.2d 535

(N.J. 2007), the New Jersey Supreme Court recognized a cause of action for hostile school

environment under the NJLAD.  That case involved students harassing another student because

of his perceived sexual orientation.  As its basis for adopting this cause of action, the court drew

on the plain language of the NJLAD, its broad remedial goal, and evidence of the prevalence of peer sexual harassment in schools.  Id. at 547.  The court also reasoned that not recognizing the cause of action "would be incongruous with the LAD's prohibition of discrimination in other settings, including the workplace," and that such claims against school districts for failing to reasonably address peer-based, affectional orientation harassment . . . further[s] the Legislature's goal of eradicating the invidious discrimination faced by students in our public schools."  Id. While a portion of the L.W. court's reasoning was particular to the problem of sexual harassment in schools, the court's interpretation of the plain meaning of the NJLAD and its "broad remedial goal" apply with equal force in the context of race-based harassment.  Thus, the Court can discern no reason why this state's highest court would not extend its holding in L.W. to also include harassment due to a student's race.  In addition, the United States Supreme Court has stated that "[a]n unbroken line of cases following Brown v. Board of Education establishes beyond doubt this Court's view that racial discrimination in education violates a most fundamental national public policy, as well as rights of individuals."  Bob Jones Univ. v. United States, 461 U.S. 574, 593 (1983).  Indeed, the court in L.W. frames its holding in one iteration in terms of a student plaintiff's "protected characteristic"; thereby contemplating such an application to future cases.  L.W., 915 A.2d at 547.

Hence, to state a claim under the NJLAD for a hostile school environment, "an aggrieved student must allege discriminatory conduct that would not have occurred 'but for' the student's protected characteristic, that a reasonable student of the same age, maturity level, and protected characteristic would consider sufficiently severe or pervasive enough to create an intimidating, hostile, or offensive school environment, and that the school district failed to reasonably address

42

such conduct." Id.  Citing law pertaining to hostile work environments, the L.W. court states that

a school is liable for a hostile school environment when it grants a supervisor authority to control

the school environment and the supervisor either abuses that authority or has actual or

constructive knowledge of the harassment and fails to take effective measures to end the

discrimination.  Id. at 548 (citing Lehmann v. Toys R Us, Inc., 626 A.2d 445, 463 (N.J. 1993).

Furthermore, in evaluating the adequacy of the school's response to peer harassment, the

factfinder "must determine the reasonableness of a school district's response to peer harassment

in light of the totality of the circumstances."  Id. at 551.

       Here, Plaintiffs have adduced evidence of discriminatory conduct that would not have

occurred 'but for' the student's protected characteristic.  Plaintiffs suggest that Glendon's

classmates did not realize before the November 24 incident with his mother that Glendon, who is

light-skinned, was black, because it was only after that date that they started harassing him.

Also, Glendon testified that his classmates called him racially derogative names.  Moreover, a

jury could easily conclude that a reasonable student of the same age, maturity level, and protected

characteristic would consider racial slurs, sexually obscene taunts, and physical abuse lasting up

to eighteen months sufficiently severe or pervasive to create an intimidating, hostile, or offensive

school environment.  Finally, Plaintiffs have produced abundant evidence that school officials,

including Principal Smith, failed to take action to end Glendon's torment.  (See, e.g., Pls.' App.

at 41-41, Davenport at 76-77.)  As a result, School Defendants' and Davenport's motions for

summary judgment on Plaintiffs' NJLAD claim of a hostile school environment will be denied.

To the extent that Plaintiffs advance an NJLAD claim against Sea Isle City, Gansert, Kennedy, or

Felsing, those Defendants will be granted summary judgment.  Plaintiffs have not adduced

sufficient evidence to link any of these Defendants to the hostile school environment.

### H.    Tort of Malicious Prosecution

In addition to their malicious prosecution claim under the Fourth Amendment, Plaintiffs also alleged the intentional tort.  Under New Jersey law, the common law elements of a malicious prosecution action arising out of a criminal prosecution are: (1) the criminal action was instituted by the defendant against the plaintiff, (2) it was actuated by malice, (3) there was an absence of probable cause for the proceeding, and (4) the criminal proceeding was terminated favorably to the plaintiff.  Lind v. Schmid, 67 N.J. 255, 262 (1975).  As already established in the context of Fourth Amendment malicious prosecution, it is undisputed that Defendants initiated criminal charges against Waters-Rice and that those charges were dismissed by the prosecutor and that questions of fact remain about whether probable cause existed for her arrest and about whether Defendants acted maliciously.  Thus, Defendants' summary judgment motions will be denied, unless they can find refuge in the New Jersey Tort Claims Act ("TCA").

The New Jersey Tort Claims Act provides, in part, "a public employee is not liable if he acts in good faith in the execution or enforcement of any law.  Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."  N.J. Stat. Ann. § 59:3-3. To merit immunity under section 59:3-3, the action giving rise to the plaintiff's claims must have been carried out in good faith.  New Jersey courts have defined "good faith," in this context to mean objectively reasonable conduct.  Hayes v. Mercer County, 526 A.2d 737, 741 (N.J. Super. Ct. App. Div.), certif. denied, 532 A.2d 226 (1987).  Accordingly, § 59:3-3 cannot shield Defendants Gansert, Felsing, or Smith from liability, because the tort requires malicious intent.

Sea Isle City and Kennedy, however, are entitled to summary judgment on this claim.

Under the TCA, public entities cannot be held liable "for acts or omissions of a public employee constituting a crime, actual fraud, actual malice, or willful misconduct." N.J. Stat. § 59:2-10. As Sea Isle City is a "public entity," see N.J. Stat. Ann. § 59:1-3, it cannot be liable for intentional torts committed by its employees, and this Court will dismiss Plaintiff's malicious prosecution claim against Sea Isle City. Likewise, Plaintiffs have no evidence linking Kennedy to the actions giving rise to Waters-Rice's claim of malicious prosecution; therefore, Plaintiffs cannot prove that Kennedy performed the action leading to the damages she alleges.

Defendants Gansert, Kennedy, Felsing, Smith, and Rodger also argue that they deserve summary judgment based on § 59:9-2(d) of the New Jersey Tort Claims Act. That provision provides that a plaintiff cannot recover pain and suffering damages from a public entity or public employee, except "in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00." The New Jersey Supreme has held that in certain circumstances, psychological and emotional injuries such as posttraumatic stress disorder should be treated the same as physical injuries for purposes of § 59:9-2(d). Collins v. Union County Jail, 696 A.2d 625, 632 (N.J. 1997) (holding plaintiff's claim of permanent psychological injury in form of posttraumatic stress disorder resulting from being raped by corrections officer may constitute a "permanent loss of a bodily function" even absent residual physical injury); see also Frugis v. Bracigliano, 798 A.2d 614, 629 (N.J. Super. Ct. App. Div. 2002) (finding allegations of sexual abuse sufficient aggravating circumstances which, if accompanied by a permanent posttraumatic stress disorder, which is substantial), rev'd on other grounds, 827 A.2d 1040 (N.J. 2003).

Here, there is sufficient evidence to surpass the threshold of § 59:9-2(d) and to permit the

question to go to a jury.  Plaintiffs submit the report of their medical expert, Dr. Robert Sadoff, who attests that Waters-Rice suffers from posttraumatic stress disorder and severe depression stemming from "the traumatic experiences of racial discrimination and inappropriate arrest." (See Pls.' App. 376-79.)  Furthermore, Dr. Sadoff stated that Waters-Rice requires treatment costing approximately $15,000 per year, well in excess of the damages threshold of § 59:9-2(d). Like the plaintiffs in Collins and Frugis, Waters-Rice suffered an intentional tort that resulted in serious and lasting psychological injury.  The court in Collins cited the plaintiff's frequent nightmares, flashbacks, difficulty in sleeping, sudden outbursts of crying, screaming in his sleep, severe loss of self-esteem, and inability to trust others; similarly, Waters-Rice suffers from nightmares, sleeplessness, flashbacks, suicidal ideation, and also attempted suicide on one occasion.  Therefore, Defendants are not entitled to summary judgment on Waters-Rice's pain and suffering damages for the tort of malicious prosecution.

In sum, Sea Isle City and Kennedy are entitled to summary judgment on Plaintiffs' tort claim for malicious prosecution, but Smith, Rodger, Gansert, and Felsing are not and are subject to the jury's determination of whether Waters-Rice merits damages for pain and suffering on that claim.

### I.       Punitive Damages

Defendants seek to limit their exposure to punitive damages on both Plaintiffs' federal constitutional claims and on their NJLAD claims.  Plaintiffs do not respond with any arguments regarding punitive damages.

### i.       42 U.S.C. § 1983 and § 1985

Defendants Sea Isle City, Gansert, Kennedy, and Felsing argue that Plaintiffs may not

recover punitive damages against them on Plaintiffs' federal constitutional claims.

Municipalities are immune from punitive damages on § 1983 and § 1985 claims.  City of

Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981); see also Bell v. City of Milwaukee,

746 F.2d 1205, 1270 (7th Cir. 1984) (interpreting City of Newport as precluding punitive

damages in suits pursuant to § 1985 as well as § 1983), overruled on other grounds, Russ v.

Watts, 414 F.3d 783 (7th Cir. 2005).  Similarly, punitive damages are not available against

municipal employees when sued in their official capacities.  Gregory v. Chehi, 843 F.2d 111, 120

(3d Cir. 1988).  Therefore, Sea Isle City is not liable for punitive damages on any of Plaintiffs'

alleged federal constitutional violations, nor are Gansert, Kennedy, and Felsing in their official

capacities.

     The Court will next address Defendants' liability for punitive damages under § 1983 in

their individual capacities.  Plaintiffs are entitled to punitive damages only if they can establish

that "the defendants have acted with a 'reckless or callous disregard of, or indifference to, the

rights and safety of others.'"  Keenan v. City of Phila., 983 F.2d 459, 470-71 (3d Cir. 1992)

(quoting Bennis v. Gable, 823 F.2d 723, 734 (3d Cir. 1987)).  The standard of "callous or

reckless indifference" is an objective one, inquiring "whether a reasonable officer would have

known that his conduct violated a clearly established constitutional right."  Russoli v. Salisbury

Twp., 126 F. Supp. 2d 821, 873 (M.D. Pa. 2000).  As to each Defendant, Plaintiffs have amassed

enough evidence from which a jury could find that they acted with a reckless or callous disregard

of or indifference to Plaintiffs' rights.  No individual defendants warrant summary judgment on

Plaintiffs' punitive damage claims.

          ii.     NJLAD

47

To recover punitive damages under the NJLAD, a plaintiff must show more than the minimum conduct necessary to prove the underlying claim.  Weiss v. Parker Hannifin Corp., 747 F. Supp. 1118, 1135-36 (D.N.J. 1990).  In particular, the plaintiff must establish that (1) upper management was an actual participant in the alleged wrongdoing or was willfully indifferent to the alleged wrongdoing, and (2) that the alleged misconduct was especially egregious.  Rendine v. Pantzer, 661 A.2d 1202, 1215 (N.J. 1995).  To constitute especially egregious conduct, the alleged misconduct must have been "wantonly reckless or malicious" and there must be "an intentional wrongdoing in the sense of an evil-minded act or an act accompanied by a wanton and willful disregard of the rights of another."  Nappe v. Anschelewitz, Barr, Ansell & Bonello, 477 A.2d 1224, 1230 (N.J. 1984).  As with Plaintiffs' punitive damages claim under § 1983, a jury could also conclude that Defendants' conduct merits punitive damages.  In particular, much of the alleged discriminatory conduct was carried out by Smith, who qualifies as "upper management" since she is the principal of Sea Isle City School.  Likewise, Davenport was a school administrator.  Thus, a jury could reasonably find that the conduct alleged by Plaintiffs was especially egregious.

### J.    Police Department

City Defendants argue that the Police Department must be dismissed from the case because it is merely an administrative arm of Sea Isle City.  "In New Jersey a municipal police department is not an entity separate from the municipality, N.J. Stat. Ann. § 40A:14-118 (municipal police department is 'an executive and enforcement function of municipal government'); therefore, the . . . Police Department is not a proper defendant in this action."  Adams v. City of Camden, 461 F. Supp. 2d 263, 266 (D.N.J. 2006); see also Padilla v. Twp. of

Cherry Hill, 110 F. App'x 272, 278 (3d Cir. 2004); DeBillis v. Kulp, 166 F.2d 255, 264 (E.D. Pa.

2001). Since the Police Department is not an entity separate from the municipality, it cannot be

sued in conjunction with the municipality. See Adams, 461 F. Supp. 2d at 266. Accordingly, the

Court will dismiss the Police Department from the suit.

## IV.   CONCLUSION

Based on the foregoing reasoning, the Court will grant City Defendants' motion on

Plaintiffs' claim that Gansert and Kennedy violated their right to be free from unreasonable

searches; on Plaintiffs' Fourteenth Amendment and New Jersey constitutional claims against

Kennedy; on Plaintiffs' claims of discriminatory surveillance in violation of the Fourteenth

Amendment and the New Jersey Constitution against Kennedy and Gansert; on Plaintiffs' claims

of retaliation in violation of § 1983, the New Jersey Constitution, and the NJLAD against Sea

Isle City, Gansert, and Kennedy; on Plaintiffs' tort claims against Sea Isle City and Kennedy for

malicious prosecution; and on Plaintiffs' claim for punitive damages against Sea Isle City for any

federal constitutional violations. City Defendants' motion will be denied in all other respects.

The Court will grant Felsing's motion on Plaintiffs' claim that he violated their Fourth

Amendment right to be free from unreasonable searches; that he violated their Fourteenth

Amendment rights and the New Jersey Constitution by conducting discriminatory surveillance;

and that he retaliated in violation of § 1983, the New Jersey Constitution, and the NJLAD.

Felsing's motion will be denied in all other respects. The Court will grant School Defendants'

motion on Plaintiffs' claim of a hostile school environment in violation of the Fourteenth

Amendment and deny it in all other respects. The Court will grant Davenport's motion on

Plaintiffs' Fourteenth Amendment and New Jersey constitutional claims against her, including

Plaintiffs' constitutional claim of a hostile school environment.  The Court will deny Davenport's

motion in all other respects.  The Court will deny Tegler's motion in its entirety.  And as

previously stated, the Court will grant Kennedy's motion on Plaintiffs' claim that he violated

their right to be free from unreasonable searches; on Plaintiffs' Fourteenth Amendment and New

Jersey constitutional claims; on Plaintiffs' claims of discriminatory surveillance in violation of

the Fourteenth Amendment and the New Jersey Constitution; on Plaintiffs' claims of retaliation

in violation of § 1983, the New Jersey Constitution, and the NJLAD; and on Plaintiffs' tort

claims against him for malicious prosecution.  Furthermore, the Court will dismiss Sea Isle City

Police Department from the case with prejudice.  An accompanying Order shall issue today.


Dated: 3/31/08                                      s/ Robert B. Kugler
                                                   ROBERT B. KUGLER
                                                   United States District Judge


50